1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   GRACIELA JACOBO,                         No.  1:22-cv-00672-DAD-BAK (BAM)

12                  Plaintiff,

13          v.                                ORDER GRANTING PLAINTIFF'S *EX
                                              PARTE* MOTION FOR A TEMPORARY
14   JOHN DOE,                                RESTRAINING ORDER

15                  Defendant.                (Doc. No. 2)

16

17

18          On June 3, 2022, plaintiff Graciela Jacobo, proceeding with counsel, filed the complaint in

19   this action against an unidentified John Doe defendant, asserting claims of fraudulent inducement,

20   negligent misrepresentation, replevin, conversion, unjust enrichment, imposition of a constructive

21   trust and disgorgement of funds, and possession of stolen property in violation of California Penal

22   Code § 496.  (Doc. No. 1 ("Compl.").)  Plaintiff seeks restitution, the imposition of a constructive

23   trust, and damages arising from the alleged harm caused to her by the defendant's actions.  (*Id.* at

24   14.)  With her complaint, plaintiff also filed an *ex parte* motion for a temporary restraining order

25   seeking to freeze defendant's cryptocurrency assets at the specified cryptocurrency wallet

26   addresses.  (Doc. No. 2-1 at 8–9.)  Pursuant to General Order No. 617 addressing the public

27   health emergency posed by the coronavirus pandemic, on June 6, 2022, the court took this matter

28   under submission to be decided on the papers, without holding a hearing.  (Doc. No. 5.)  For the

1  reasons explained below, the court will grant plaintiff's motion for a temporary restraining order.

2                                    **BACKGROUND**

3          In her complaint and accompanying declaration (Doc. No. 2-4), plaintiff alleges the

4  following.  Plaintiff jointly maintains a MetaMask cryptocurrency wallet with her son, who

5  remains unnamed in the complaint.  (Compl. at ¶ 11.)  At all relevant times, plaintiff's son served

6  as plaintiff's authorized agent who could communicate on her behalf, and plaintiff conferred with

7  her son on the relevant matters at issue.  (*Id.* at ¶¶ 12, 15.)  On or about May 5, 2022, defendant

8  John Doe contacted plaintiff's son through the social networking service Twitter.  (*Id.* at ¶ 11.)

9  Thereafter, defendant continued his conversation with plaintiff's son on the WhatsApp messaging

10 platform, where they discussed cryptocurrency investing and defendant represented that "he could

11 show [p]laintiff how easy it was to make money with cryptocurrency."  (*Id.*)  Defendant also

12 represented that he and the entity that employed him were affiliated with the Ethereum

13 Foundation, a well-known organization that supports the Ethereum cryptocurrency platform and

14 related technologies.  (*Id.* at ¶ 13.)  Through defendant's communications, plaintiff and plaintiff's

15 son developed "a sense of trust, reliability, and dependability" on defendant.  (*Id.* at ¶ 15.)

16         Following defendant's instruction, plaintiff or plaintiff's son linked plaintiff's MetaMask

17 cryptocurrency wallet to the website www.AMMDeFi.org, which defendant represented "would

18 allow [p]laintiff to have her assets placed into a liquidity pool for a limited period of time."  (*Id.*

19 at ¶ 16.)  According to defendant, plaintiff would receive a return of her invested assets with

20 interest upon expiration of that limited period of time.  (*Id.*)  Plaintiff funded her MetaMask

21 wallet with approximately $1,400,000.00, used those funds to purchase the Tether

22 cryptocurrency, and invested the Tether into the liquidity pool vehicle purportedly managed by

23 defendant.  (*Id.* at ¶ 17.)  Plaintiff alleges, however, that the investment vehicle proved to be

24 "nothing but a sham vehicle designed by [d]efendant to gain direct access to the funds in

25 [p]laintiff's MetaMask wallet," and that defendant provided false updates as to the balance of

26 plaintiff's investment position.  (*Id.* at ¶¶ 18–19.)

27         Each time plaintiff sought to withdraw her funds from the liquidity pool, defendant

28 offered false excuses as to why she would be unable to do so, including representing that

1   withdrawal would require an exit fee of several hundred thousand dollars.  (*Id.* at ¶¶ 20–21.)

2   Plaintiff alleges that defendant manufactured this exit fee excuse to keep plaintiff's funds under

3   defendant's control long enough for defendant to transfer her assets to himself and to take "every

4   available opportunity" to sieve additional funds from plaintiff.  (*Id.* at ¶¶ 22–23.)

5         Plaintiff alleges that blockchain analytics have traced the path of plaintiff's

6   cryptocurrency assets to unauthorized transfers to "cryptocurrency accounts under [d]efendant's

7   sole control," which may "have been liquidated into fiat currency and dissipated by [d]efendant."

8   (*Id.* at ¶ 24.)  Plaintiff identifies a number of cryptocurrency wallet addresses ("Destination

9   Addresses") to which her stolen assets have been traced and alleges that those wallet addresses

10   are owned or controlled by defendant or an unknown third party "to whom he has transferred

11   those stolen assets and which have been used to launder" plaintiff's assets.  (*Id.* at ¶ 25.)  Plaintiff

12   provides the following cryptocurrency wallet addresses at the Binance, FTX, OKX (OKEx),

13   Poloniex, TokenIon, and gate.io cryptocurrency exchanges:

14

15

| Exchange | Destination Address | Asset Type | Funds under claim[1] |
|---|---|---|---|
| **Binance** | 43ecaea7f78fe65f83646a864b2c73349793ddfe | USDT | 45,730.26604 |
| **Binance** | 5cccacf95cd5df55d95e3864af4551de094784c2 | USDT | 222,583.588 |
| **Binance** | 8f44af4f841ffd7db201e81f8deb66e6eea99c06 | USDT | 45,543.36493 |
| **Binance** | bff9f1d0d9156feb7b3182102d4ac226b9c2c44c | USDT | 95,118.95336 |
| **Binance** | c7e185922f923c438fc29b92309153816ba17498 | USDT | 4,082.182561 |
| | | TOTAL | **413,058.3549 USDT** |

| Exchange | Destination Address | Asset Type | Funds under claim |
|---|---|---|---|
| **FTX** | 456fc7ea0b17b51e08a861af94e13f1dceba1db9 | USDT | 83,856.95211 |
| | | TOTAL | **83,856.95211 USDT** |

---

[1] Plaintiff represents that the value of the funds located in each of the destination addresses listed in this order were calculated using an "average confirmed with five tracing methodologies" and are listed in units of Tether ("USDT"), a cryptocurrency hosted on the Ethereum and Bitcoin blockchains that was designed so that each coin would be worth one U.S. dollar.  (Compl. at ¶ 25; Doc. No. 2-1 at 6 n.2.)

| Exchange | Destination Address | Asset Type | Funds under claim |
|---|---|---|---|
| **OKX (OKEx)** | 64452a2f3af318d86d947ba33beadfe39456ed3a | USDT | 272,540.4773 |
| | | TOTAL | **272,540.4773 USDT** |

| Exchange | Destination Address | Asset Type | Funds under claim |
|---|---|---|---|
| **Poloniex** | ee861cfb2a34eb5e73ccd92fce9e4b3b6a37a2db | USDT | 72,386.28453 |
| | | TOTAL | **72,386.28453 USDT** |

| Exchange | Destination Address | Asset Type | Funds under claim |
|---|---|---|---|
| **TokenIon** | 8d90113a1e286a5ab3e496fbd1853f265e5913c6 | USDT | 230,153.7314 |
| | | TOTAL | **230,153.7314 USDT** |

| Exchange | Destination Address | Asset Type | Funds under claim |
|---|---|---|---|
| **gate.io** | 29084a44f69510471e41a91f37ee59c088e71804 | USDT | 46,782.12103 |
| | | TOTAL | **46,782.12103 USDT** |

(*Id.*)

As noted above, plaintiff's complaint against defendant asserts the following seven causes of action for:  (1) fraudulent inducement; (2) negligent misrepresentation; (3) replevin; (4) conversion; (5) unjust enrichment; (6) imposition of a constructive trust and disgorgement of funds; and (7) possession of stolen property in violation of California Penal Code § 496.  (Doc. No. 1.)  As also noted above, plaintiff seeks restitution of the $1.4 million allegedly stolen from her by defendant, the imposition of a constructive trust over and disgorgement of the assets in the Destination Addresses, and damages arising from the alleged harm.  (*Id.* at 14.)

Plaintiff filed the pending *ex parte* motion for a temporary restraining order with her complaint.  (Doc. No. 2-1.)  In that *ex parte* motion, plaintiff seeks to freeze defendant's assets, including the assets held in the Destination Addresses, to preserve the *status quo* during the

1  litigation of this action.  (*Id.* at 9.)  Because defendant's identity is currently unknown to plaintiff,

2  defendant has not been served with the complaint or with plaintiff's pending motion for a

3  temporary restraining order.

4  **LEGAL STANDARD**

5         The standard governing the issuing of a temporary restraining order is "substantially

6  identical" to the standard for issuing a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v.*

7  *John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "The proper legal standard for

8  preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the

9  merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

10  balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans,*

11  *Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council,*

12  *Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th

13  Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just

14  possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'n, Inc. v. City of Los*

15  *Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  A plaintiff seeking a preliminary injunction must

16  make a showing on all four of these prongs.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

17  1135 (9th Cir. 2011).  The Ninth Circuit has also held that "[a] preliminary injunction is

18  appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were

19  raised and the balance of hardships tips sharply in the plaintiff's favor."  *Id.* at 1134–35 (quoting

20  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*)).[2]  The party seeking the

21  injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*, 584 F.3d

22  1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674

23  (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than merely allege imminent harm

24  sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a

---

25  [2]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale

26  approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of

27  hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

28  injunction is in the public interest."  *Id.* at 1135.

1    prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an extraordinary remedy

2    that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

3    *Winter*, 555 U.S. at 22.

4         A court may only issue a temporary restraining order without notice to the adverse party

5    when:

6         (A) specific facts in an affidavit or a verified complaint clearly show
         that immediate and irreparable injury, loss, or damage will result to
7         the movant before the adverse party can be heard in opposition [and]
         (B) the movant's attorney certifies in writing any efforts made to give
8         notice and the reasons why it should not be required.

9    Fed. R. Civ. P. 65(b)(1).  *Ex parte* temporary restraining orders "should be restricted to serving

10   their underlying purpose of preserving the *status quo* and preventing irreparable harm just so long

11   as is necessary to hold a hearing, and no longer."  *Granny Goose Foods, Inc. v. Brotherhood of*

12   *Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).

13                                          **ANALYSIS**

14   **A.    Rule 65 Notice**

15        Federal Rule of Civil Procedure 65 requires "the movant's attorney [to] certif[y] in writing

16   any efforts made to give notice and the reasons why it should not be required."  Here, plaintiff's

17   counsel has provided an affidavit attesting to the following:  (1) defendant's legal name is

18   unknown and may only be determined through expedited discovery to the cryptocurrency

19   exchanges at which he holds cryptocurrency wallets; and (2) if plaintiff must wait until after

20   discovery commences and defendant receives notice of this action, it is highly likely that

21   plaintiff's assets will be dissipated by defendant beyond the reach of recovery.  (Doc. No. 2-3,

22   Declaration of Attorney David C. Silver, at ¶¶ 6–7.)

23        The cryptocurrency at issue here "poses a heightened risk of asset dissipation."  *Fed.*

24   *Trade Comm'n v. Dluca*, No. 0:18-cv-60379-RKA, 2018 WL 1830800, at *2–3 (S.D. Fla. Feb.

25   28, 2018), *report and recommendation adopted*, No. 0:18-cv-60379-KMM, 2018 WL 1811904

26   (S.D. Fla. Mar. 12, 2018).  As one district court has explained, "cryptocurrencies are circulated

27   through a decentralized computer network, without relying on traditional banking institutions or

28   other clearinghouses.  This independence from traditional custodians makes it difficult for law

1    enforcement to trace or freeze cryptocurrencies in the event of fraud or theft[.]"  *Id.*  If defendant

2    were provided notice of this action, "it would be a simple matter for [him] to transfer [the Tether]

3    to unidentified recipients outside the traditional banking system, including contacts in foreign

4    countries, and effectively put it beyond the reach of this [c]ourt."  *Id.*

5           The court finds that issuance of relief on an *ex parte* basis is justified for the reasons set

6    forth above.  As such, the court turns to whether it may grant plaintiff's requested injunctive

7    relief.

8    **B.      An Asset Freeze is Appropriate Relief at This Stage of Litigation**

9           Typically, a court may issue an order to freeze the assets of a defendant only after the

10   claims have been brought to judgment.  *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond*

11   *Fund, Inc.*, 527 U.S. 308, 322 (1999).  However, where, as here, the plaintiff seeks equitable

12   relief (*see* Compl. at 14), a court has may grant injunctive relief to freeze a defendant's assets if

13   the requirements for a preliminary injunction are otherwise satisfied.  *In re Focus Media, Inc.*,

14   387 F.3d 1077, 1084 (9th Cir. 2004) (citations omitted).  The Ninth Circuit has specifically

15   recognized that the rule against injunctive relief does not apply to underlying claims for

16   fraudulent conveyance and constructive trust.  (*Id.* at 1085.)  Judges of this district court have also

17   ordered injunctive relief to secure assets subject to a claim for the imposition of a constructive

18   trust, which plaintiff seeks in her complaint in this action.  *See Rumbaugh v. Harley*, No. 2:18-cv-

19   01970-KJM-AC, 2018 WL 4002854, at *9 (E.D. Cal Aug 22, 2018); (Compl. at ¶ 64).

20   Furthermore, as discussed above, the fact that the assets at issue here are held in cryptocurrency

21   weighs in favor of the granting of injunctive relief and a freezing of the assets because there is a

22   high risk of asset dissipation with cryptocurrency.  *See Dluca*, 2018 WL 1830800 at *2–3

23   (holding that "[t]he same factors that justify issuance of relief on an *ex parte* basis also establish

24   that an asset freeze [of cryptocurrency] and other equitable relief are appropriate.").  The court

25   therefore finds that it has the authority to issue injunctive relief to freeze defendant's assets in this

26   matter, and now turns to address the merits of plaintiff's motion for a temporary restraining order

27   below.

28   /////

1    **C.    Whether a Temporary Restraining Order is Appropriate**

2              1.    <u>Likelihood of Success on the Merits</u>

3              Plaintiff contends that she is likely to succeed on the merits of the seven causes of action

4    asserted in her complaint.  (Doc. No. 2-1 at ¶¶ 16, 18; *see also* Compl. at 1.)  Because, as

5    explained below, the court finds that plaintiff has shown a likelihood of success on her conversion

6    claim and will grant her *ex parte* motion for temporary injunctive relief on that basis, the court

7    will not address plaintiff's likelihood of success on the merits with regard to her other claims.

8              "Conversion occurs where the defendant wrongfully exercises dominion over the property

9    of another."  *Bank of New York v. Fremont General Corp.*, 523 F.3d 902, 914 (9th Cir. 2008)

10   (citations omitted).  Under California law, the elements of a conversion claim are:  "(1) plaintiff's

11   ownership or right to possession of the property at the time of the conversion; (2) [defendant's]

12   conversion by a wrongful act or disposition of plaintiffs' property rights; and (3) damages."  *Joe*

13   *Hand Promotions, Inc. v. Roseville Lodge No. 1293*, 161 F. Supp. 3d 910, 916 (E.D. Cal. 2016).

14   "Because conversion is a strict liability claim, a defendant's 'good faith, lack of knowledge,

15   motive, or intent are not relevant' in establishing a claim for conversion."  *Id.* (quoting *Joe Hand*

16   *Promotions, Inc. v. Albright*, 2:11-cv-02260-WBS-CMK, 2013 WL 2449500, at *8 (E.D. Cal.

17   June 5, 2013)).

18             As to the first element of her conversion claim, plaintiff alleges that she added funds to

19   her digital wallet, used those funds to purchase Tether, and then allowed that Tether to be

20   invested in what she believed was a legitimate investment pool.[3]  (Doc. No. 2-1 at 6.)  Based on

21   these allegations and the declarations submitted in support thereof, the court finds that plaintiff

22   ────────────────
[3]  Plaintiff asserts that she "jointly maintains" a digital cryptocurrency wallet with her son and

23   that her son engaged in many of the online conversations with defendant related to defendant's
     alleged scheme.  (Doc. No. 2-1 at 5.)  Plaintiff maintains that plaintiff "conferred with her son on

24   all such matters" relating to their interactions with defendant.  (*Id.*)  It is unclear on the face of
     plaintiff's pending motion and complaint whether plaintiff herself purchased the $1,400,000.00

25   worth of Tether cryptocurrency and deposited it into the allegedly fraudulent investment pool or
     whether her son completed the transactions at her direction using her funds.  (*See id.* at 5–6.)

26   Nonetheless, it is immaterial whether plaintiff or her son completed the transactions described
     above, because plaintiff's motion represents that the $1,400,000.00 used to purchase Tether

27   cryptocurrency was comprised of her funds and that she "allowed" the purchased cryptocurrency
     to be deposited into the allegedly fraudulent investment pool.  (*See id.*)

28

1  will likely be able to establish that she owned the cryptocurrency at issue at the time of its alleged

2  conversion.

3        As to the second element of conversion, plaintiff alleges that when she deposited the

4  Tether into what she thought was a legitimate investment pool, the funds were "actually . . .

5  deposited under false pretenses into a cryptocurrency wallet Defendant controlled," and defendant

6  "intentionally took possession of and assumed control over" plaintiff's cryptocurrency.  (Compl.

7  at ¶ 53.)  In addition, plaintiff alleges that defendant "abscond[ed]" with her assets and "knew the

8  property he received was stolen."  (Doc. No. 2-1 at 6; Compl. at ¶ 54.)  Although plaintiff

9  willingly deposited funds into the supposed investment pool over which defendant had control, it

10  does not appear on the facts currently presented to the court that plaintiff knew that the

11  investment pool was not in fact legitimate, nor that she consented to defendant withdrawing all of

12  her funds from the purported investment pool.  *See Bank of New York*, 523 F.3d at 914 ("A

13  plaintiff in a conversion action must also prove that it did not consent to the defendant's exercise

14  of dominion. . . . [T]here can be no conversion where an owner either expressly or impliedly

15  assents to or ratifies the taking, use or disposition of his property.") (internal quotation omitted).

16  Accordingly, the court also finds that plaintiff will likely be able to establish that her

17  cryptocurrency was converted through a wrongful act of the defendant.

18        Finally, plaintiff is also likely to succeed in establishing damages, the third element of her

19  conversion claim.  As described above, plaintiff alleges that defendant's "scheme" resulted in the

20  loss of $1,400,000.00 worth of cryptocurrency that she invested into a digital wallet that

21  defendant led her to believe was a legitimate investment pool.  (Doc. No. 2-1 at 6.)  Based on

22  these allegations, plaintiff seeks "equitable restitution" to "return to [p]laintiff all cryptocurrency

23  or fiat currency taken from her in connection with" defendant's alleged scam.  (Compl. at 14); *see*

24  *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1076 (N.D. Cal. 2012) (describing

25  restitution as an available remedy for "common law tort such as conversion").  As such, the court

26  finds plaintiff will likely be able to establish that she suffered damages in the amount of $1.4

27  million worth of cryptocurrency as a result of defendant's alleged wrongful act.

28  /////

1    Therefore, the court concludes that plaintiff has shown a likelihood of success on the

2    merits of her conversion claim.

3        2.    Irreparable Harm

4    Having found that plaintiff has shown a likelihood of success on the merits of her

5    conversion claim, the court now turns to the likelihood that plaintiff will suffer irreparable harm

6    in the absence of the granting of preliminary injunctive relief.  The risk of irreparable harm must

7    be "likely, not just possible."  *All. for the Wild Rockies*, 632 F.3d at 1131.  "Speculative injury

8    does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."

9    *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

10   Here, plaintiff asserts that a likely risk of irreparable harm exists because defendant "may

11   dissipate the money . . . or simply transfer those funds into untraceable cryptocurrency accounts

12   or to offshore entities organized in unknown locations."  (Doc. No. 2-1 at 14.)  Plaintiff argues

13   that an asset freeze is imperative to avoid such dissipation due to the speed and anonymous nature

14   of cryptocurrency transactions.  (*Id.*)  Here, plaintiff does not merely seek the award of legal

15   damages, which would be insufficient to support a claim of irreparable harm due to the fungible

16   nature of money, but restitution, the imposition of a constructive trust over the cryptocurrency

17   assets in the Designation Addresses, and disgorgement of such cryptocurrency.  (Compl. at 14);

18   *cf. Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851–52 (9th Cir. 2009) ("Typically,

19   monetary harm does not constitute irreparable harm. . . . [E]conomic damages are not

20   traditionally considered irreparable because the *injury can later be remedied by a damage*

21   *award*.") (emphasis in original), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S.*

22   *Cal., Inc.*, 565 U.S. 606 (2012).  In this regard, other district courts have found that the risk of

23   irreparable harm to be likely in matters concerning fraudulent transfers of cryptocurrency due to

24   the risk of anonymous and speedy asset dissipation.  *See Heissenberg v. Doe*, No. 9:21-cv-80716-

25   RKA, 2021 WL 8154531, at *2 (S.D. Fla. Apr. 23, 2021) (finding irreparable harm to be likely if

26   a temporary restraining order were not granted due to the "speed and potential anonymity of

27   cryptocurrency transactions"); *Martinangeli v. Akerman, LLP*, No. 1:18-cv-23607-UU, 2018 WL

28   6308705, at *2 (S.D. Fla. Sept. 14, 2018) (same); *Dluca*, 2018 WL 1830800 at *2–3 (same).

1  Because "it would be a simple matter for [defendant] to transfer. . . [Tether] cryptocurrency to

2  unidentified recipients outside the traditional banking system" and effectively place the assets at

3  issue in this matter beyond the reach of the court, the court finds that plaintiff is likely to suffer

4  immediate and irreparable harm in the absence of injunctive relief.  *See Dluca*, 2018 WL 1830800

5  at *2.

6          3.    <u>Balance of the Equities / Public Interest</u>

7         Courts "must balance the competing claims of injury and must consider the effect on each

8  party of the granting or withholding of the requested relief," and "should pay particular regard for

9  the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S.

10  at 24.  "In assessing whether the plaintiffs have met this burden, the district court has a duty to

11  balance the interests of all parties and weigh the damage to each."  *Stormans, Inc.*, 586 F.3d at

12  1138 (internal quotation marks and alteration omitted).

13         In her pending motion for temporary restraining order, plaintiff argues that public interests

14  support a grant of injunctive relief here because it would "provid[e] assurance that courts will

15  protect investors' assets from theft and will aid investors in their recovery of stolen assets," and,

16  in doing so, "promote the objectives" of the Financial Crimes Enforcement Network (FinCEN)

17  division of the U.S. Department of the Treasury.  (Doc. No. 2-1 at 15.)  Plaintiff also asserts that

18  defendant would not be prejudiced by the granting of injunctive relief because such an order

19  would merely maintains the *status quo* and would only delay defendant from being able to shift

20  the assets to other accounts.  (*Id.* at 14.)

21         Plaintiff's points are well taken.  A delay in defendant's ability to transfer the assets only

22  minimally prejudices defendant, whereas withholding injunctive relief would severely prejudice

23  plaintiff by providing defendant time to transfer the allegedly purloined assets into other accounts

24  beyond the reach of this court.  *See Heissenberg*, 2021 WL 8154531 at *2 (finding the balance of

25  hardships favored plaintiff on similar facts); *Martinangeli*, 2018 WL 6308705 at *2 (same).

26  Furthermore, the public interest "is properly served by promoting the objectives of . . . FinCEN"

27  and providing assurance to the public that courts will take action to promote protection of assets

28  /////

1    and recovery of stolen assets "when they can be readily located and traced to specific locations."

2    *Heissenberg*, 2021 WL 8154531 at \*2.

3        Thus, the balance of equities and public interest favor the granting of injunctive relief in

4    this case.

5    **D.**     **Bond Requirement**

6        Federal Rule of Civil Procedure 65(c) requires the party moving for a temporary

7    restraining order to "give[] security in an amount that the court considers proper to pay the costs

8    and damages sustained by any party found to have been wrongfully enjoined or restrained."

9    Because defendant's identity is unknown at this time, there is no evidence before the court

10    demonstrating that defendant will suffer any damages as a result of the requested temporary

11    restraining order.  Therefore, the court will not require plaintiff to post a bond at this time.  *See*

12    *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) ("The

13    district court is afforded wide discretion in setting the amount of the bond, and the bond amount

14    may be zero if there is no evidence the party will suffer damages from the injunction.") (internal

15    citation omitted).

16                            **CONCLUSION**

17        For the reasons stated above, plaintiff's motion for a temporary restraining order (Doc.

18    No. 2) is granted pursuant to the terms below:

19       1.     The court orders that, pending a hearing on a motion for a preliminary injunction,

20                defendant and any person or entity acting in concert with him shall be restrained

21                and enjoined from withdrawing, transferring, or encumbering any assets currently

22                held by, for, or on behalf of defendant or any business entity which acts in concert

23                with him, including but not limited to those assets currently held in:

24                a.     The Destination Addresses (*see* Compl. at ¶ 25), and

25                b.     Any cryptocurrency wallet or cryptocurrency trading account they

26                       maintain or control anywhere other than in the Destination Addresses;

27       2.     No bond shall be required to be posted by plaintiff pursuant to Rule 65(c) of the

28                Federal Rules of Civil Procedure;

3.      Notice was not provided to defendant prior to entry of this order because his identity is presently unknown to plaintiff.  Plaintiff is directed to file a motion for expedited discovery in this action within fourteen days (14) of the entry of this order so that she may seek to obtain defendant's identity from the recipient cryptocurrency exchanges listed above, including a physical and/or electronic address at which defendant can be given notice of the claims asserted against him in this lawsuit as well as of this order;

4.      Plaintiff is directed to submit a status report to the court with respect to any motion for expedited discovery in this action and any motion for a preliminary injunction no later than fourteen (14) days from the date of this order;

5.      Within seven (7) days of learning defendant John Doe's true legal identity and obtaining his contact information, plaintiff shall serve copies of the complaint (Doc. No. 1), plaintiff's motion for temporary restraining order (Doc. No. 2), and this order on defendant John Doe in accordance with Rule 4 of the Federal Rules of Civil Procedure;

6.      This temporary restraining order will expire fourteen (14) days from its entry in accordance with Fed. R. Civ. P. 65(b)(2) unless, for good cause shown, this order is extended (or defendant consents that it should be extended) for a longer period of time;

7.      Defendant is notified of his right to apply to the court for modification or dissolution of this temporary restraining order, if appropriate and supported by a showing of good cause, on two (2) days' notice or such shorter notice as the court may allow.  *See* Fed. R. Civ. P. 65(b)(4) and Local Rule 231(c)(8); and

/////
/////
/////
/////
/////

8.     Defendant is advised that his failure to timely serve and file an opposition, or appear at a hearing on a motion for preliminary injunction, may result in the imposition of a preliminary injunction against him pursuant to Rule 65 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

Dated:   **June 7, 2022**

UNITED STATES DISTRICT JUDGE